# STATE OF FLORIDA
## DIVISION OF ADMINISTRATIVE HEARINGS

\*\*,

    Petitioner,

vs.   Case Nos. 22-1835E
                                23-0250E

DUVAL COUNTY SCHOOL BOARD,

    Respondent.

_____/

## FINAL ORDER

A due process hearing was held in this matter before Brittany O. Finkbeiner, an Administrative Law Judge of the Division of Administrative Hearings ("DOAH"), on March 23 and 24, 2023, in Jacksonville, Florida.

### APPEARANCES

For Petitioner:    Beverly Oviatt Brown, Esquire
                        Three Rivers Legal Services, Inc.
                        3225 University Boulevard South, Suite 220
                        Jacksonville, Florida  32216

                        Daniel Marshall, Esquire
                        Southern Legal Counsel, Inc.
                        1229 Northwest 12th Avenue
                        Gainesville, Florida  32601

For Respondent:   Kelly Hebden Papa, Esquire
                        Rebekah Gleason Hope, Esquire
                        Office of the General Counsel
                        117 West Duval Street, Suite 480
                        Jacksonville, Florida  32202

### STATEMENT OF THE ISSUES

Whether Respondent, Duval County School Board ("Respondent" or "School Board"), designed an Individualized Education Plan ("IEP") which

provided a free and appropriate public education ("FAPE") to Petitioner; and whether the School Board failed to implement Petitioner's IEP, thereby denying the student FAPE.

### PRELIMINARY STATEMENT

On June 22, 2022, Petitioner filed a Request for Due Process Hearing ("Request"). The relief requested by Petitioner in the initial complaint was "[p]rovide compensatory services for denials of FAPE. Place Petitioner in an appropriate school. Provide for independent evaluation." On August 2, 2022, the undersigned scheduled the due process hearing by Zoom conference for October 11 and 12, 2022. On September 14, 2022, Respondent filed an Uncontested Motion for Continuance, requesting additional time to resolve the matter, as two of the three remedies requested by Petitioner had been offered and accepted by Petitioner, and the last remedy requested, that of compensatory services, would be based on the Independent Educational Evaluation that was being completed. After the undersigned granted several continuances to afford the parties more time to confer and attempt resolution, Petitioner filed an Unopposed Motion to Set and Status Report on January 17, 2023.

Petitioner filed another Request with DOAH, involving one week of extended school year services, in DOAH Case No. 23-0250. On January 24, 2023, Petitioner filed an Unopposed Motion to Consolidate Cases 22-1835 and 23-250. On January 27, 2023, this Tribunal entered an Order of Consolidation. Although a number of various issues were mentioned in the Requests and at the due process hearing, the undersigned construes the remaining issues between the parties in this case to be as set forth in the Statement of the Issues section above.

At the due process hearing, Petitioner presented the testimony of Petitioner's father, Dr. Edward Taylor, Jason Merkison, Rebekah Wallis, Rachel Whorton, Megan Luten, Stacy McDougald, Padrica Mendez, Nicole Smith, Shanquilla Robinson, Penny Mendez, Jacqueline Casey, Jeanette Hawthorne, Dinah Stewart, Annessia Powell, and Theresa Inman. Respondent called Alonda Billings, Jamie King, and Gayle Cane. Joint Exhibits Bates numbered 1-996 were filed. Respondent objected to Exhibits Bates numbered 740-933 based on the applicable statute of limitations. Those Exhibits were admitted to develop background and to refresh Petitioner's father's recollection.

For stylistic convenience, the undersigned will use male pronouns in this Final Order when referring to Petitioner. The male pronouns are neither intended, nor should be interpreted, as a reference to petitioner's actual gender.

### FINDINGS OF FACT

1. Petitioner meets eligibility requirements to receive services under the Individuals with Disabilities Education Act ("IDEA") as a student with a Language Impairment ("LI").

2. Petitioner has Attention Deficit Disorder, which is a disorder that has a broad limiting effect on learning, living, and problem solving.

3. On February 27, 2020, School Psychologist Nicole Smith conducted a psychoeducational re-evaluation of Petitioner. She found that Petitioner's cognitive skills were in the Very Low range. Among other things, she recommended academic interventions targeted at deficit areas, and made recommendations that included "involv[ing] as many senses as possible in learning activities."

3

4. More recent testing revealed similar results. During the summer of 2022, Dr. Taylor conducted a comprehensive psychoeducational evaluation. Dr. Taylor has been a licensed psychologist for 42 years.

5. Dr. Taylor found that "the language-based intellect being at the 14th percentile, essentially the low average range indicates that Petitioner has limitations and learning challenges because of intellectual capacity."

6. According to Dr. Taylor, Petitioner's "underperformance academically is notably determined and is driven in part by that overall cognitive inefficiency and part of that is the overall intellectual limitations and part of those processing difficulties." Dr. Taylor further testified that "looking at his verbal IQ and looking at his basic reading skills and sight word reading, those are commensurate."

7. Ultimately, Dr. Taylor explained:

> There is going to be a point in which he reaches a ceiling. And I don't think that ceiling is much higher than what has been achieved with the basic reading skills and his verbal IQ.

8. Dr. Taylor testified that it is possible to receive FAPE and have first-grade reading and math while in the fifth grade.

9. Dr. Taylor testified that he did not find any evidence of Petitioner having what he considered "substantial behavior issues in school."

10. Petitioner attended School A in fourth grade (2020-2021 school year).

11. In fourth grade, Petitioner was functioning at a first-grade level in math based on his I-Ready assessment. Petitioner was supported five days a week by an Exceptional Student Education ("ESE") teacher who sometimes worked with him in the classroom and at other times pulled him out of the classroom. If the ESE teacher was not available, his classroom teacher, Ms. Mendez, would work with him one on one. Petitioner sometimes had behavioral problems.

12. Ms. Stewart was the principal at School A when Petitioner was a student there. She saw Petitioner an average of once or twice per day.

4

Ms. Stewart saw a lot of potential in Petitioner and would pull him aside to have conversations with him if she saw him making bad choices in the hallways. It was her goal to build a relationship with Petitioner so that he would feel comfortable coming to her if he needed someone to talk to. During his fourth-grade year, Petitioner had 16 referrals. Ms. Stewart testified that the referrals were not for a single target behavior, but rather, for various reasons.

13. Ms. Wallis was assigned to provide instructional program support when Petitioner attended School A during fourth grade. She was assigned to provide support as a preventative measure based on her knowledge of Petitioner's behavioral challenges from his previous school. Initially, Ms. Wallis went to School A to conduct an observation of Petitioner, spending several hours observing him in the classroom, the cafeteria, and at recess. Based on her observation, Ms. Wallis testified that if she did not know which student she was there to observe, she would not have been able to pick Petitioner out because his behavior was on par with his peers.

14. Ms. Wallis also helped support the teachers in the development of Petitioner's IEP. The IEP included a Behavior Support Plan as a safeguard because of Petitioner's reported behavioral history from his previous school. There were no significant behaviors that were being observed, so Ms. Wallis did not believe that a functional behavioral assessment ("FBA") was warranted at that time.

15. Petitioner's father later consented to an FBA/behavior intervention plan ("BIP") on March 1, 2021. The BIP was implemented beginning in April 2021, and throughout the remainder of Petitioner's fourth-grade school year.

16. The behaviors of concern were verbal profanity, making threats, and verbal aggression. Petitioner's FBA showed that his behavior was worse at the beginning of the day and during transitions, while improving when working in a small group.

5

17. Petitioner's fourth-grade IEP dated June 1, 2020, indicated special considerations in behavior, communication, and extended school year. The IEP dated August 26, 2020, indicated special considerations in behavior, communication, and assistive technology.

18. Petitioner's fourth-grade general education teacher, Ms. Casey, testified that Petitioner would be pulled out of class for reading help three days a week in a small group. He also received additional one-on-one pull-out support. Ms. Casey testified that Petitioner's classroom behavior was typically "pretty good." Even with COVID restrictions in place at the time, Ms. Casey was able to implement all of Petitioner's accommodations.

19. Ms. Hawthorne was Petitioner's school counselor at School A. Although she believed that Petitioner was a compassionate young man overall, Ms. Hawthorne observed that Petitioner would name-call other students. Ms. Hawthorne checked in with Petitioner on a daily basis, often multiple times throughout the day, and offered incentives for positive behavior. Ms. Hawthorne testified that she "had a really good rapport" with Petitioner. Ms. Hawthorne also worked on Petitioner's FBA, which she described as "an ongoing document" built from gathering data; looking at antecedents to behaviors; using consequences and rewards; then coming back to the table to add more data over time.

20. Ms. Robinson was Petitioner's fourth-grade ESE teacher. Ms. Robinson pulled Petitioner out of other classes to work with him on phonics and gave him small-group instruction for math and support facilitation five times a week. She did not observe any behavioral problems with Petitioner. Ms. Robinson testified that Petitioner made progress with phonics during his fourth-grade year, also progressing to a second-grade level in vocabulary and comprehension. Petitioner also achieved IEP goals and made progress in math.

21. Petitioner attended School B for his fifth-grade year (2021-2022 school year).

22. Petitioner's fifth-grade IEP indicated special considerations in communication, behavior, assistive technology, and extended school year.

23. During Petitioner's fifth-grade year, he made substantial progress in reading development after an Orton-Gillingham model was introduced. Dr. Taylor believed that it would be beneficial for Petitioner to continue with that model given his progress.

24. By the end of his fifth-grade year, Petitioner's IEP team agreed that Petitioner was not exhibiting any behaviors that impacted his learning or that of others, which was memorialized in his May 13, 2022, IEP.

25. Ms. McDougald was Petitioner's English teacher when he was in fifth grade. She did not have any behavioral issues with him in class, but observed that his behavior was sometimes aggressive in the mornings before his medication kicked in. Petitioner left Ms. McDougald's class daily for small-group ESE services.

26. Ms. Mendez is an ESE teacher at School B; she worked with Petitioner when he was in fifth grade. When Ms. Mendez first met Petitioner, he was in second grade. She recalled that he had some behavioral problems, but that his behaviors were under control by the fifth grade after he began taking the appropriate medications.

27. During his fifth-grade year, Petitioner made a gain of 138 points on his math assessment between January and April. Petitioner also made a gain of 228 points on his Star reading assessment.

28. For his sixth-grade year (2022-2023 school year), the timeframe during which the due process hearing was held, Petitioner was attending School C. School C uses an Orton-Gillingham model throughout their educational programing.

29. Mr. Merkison, Respondent's regional supervisor for the Northwest Elementary Support Team, assisted Petitioner's father in getting Petitioner

7

into School C, even contacting the principal of School C to advocate for Petitioner's enrollment after the school choice deadline had passed. Mr. Merkison also assisted Petitioner's father in signing up for bus service to extended school year services when Petitioner's father did not initially complete the necessary paperwork for transportation. Petitioner missed the first week of his extended school year instruction because he did not have transportation. There is no evidence that would indicate that it was Respondent's fault that Petitioner did not have transportation at that time.

30. Ms. Powell, the principal at School C, testified that School C is a parent-choice academy for students in first through eighth grade, specializing in teaching and working with students with dyslexia or other reading and language-based disabilities. The curriculum at School C centers around Orton-Gillingham, which is a multi-sensory methodology based on the science of reading. The same methodology is applied across subject-areas.

31. At School C, Petitioner is confident, fits in with his classmates, and is making friends. At the time of the due process hearing, Petitioner was not at grade level but was continually making progress toward closing the achievement gap. Ms. Powell testified that, based on Petitioner's current progress, he is on track to graduate from high school.

## Conclusions of Law

32. DOAH has jurisdiction over the parties to and the subject matter of this proceeding. §§ 1003.57(1)(a) and 1003.5715(5), Fla. Stat.; and Fla. Admin. Code R. 6A-6.03311(9)(u).

33. Petitioner bears the burden of proof with respect to each of the issues raised herein. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

34. At all times relevant to the Request, Petitioner was a student with a disability as defined under 34 C.F.R. § 300.8(a)(1); 20 U.S.C. § 1401(3)(A)(i); and Florida Administrative Code Rule 6A-6.03411(1)(f).

35. Respondent is a local educational agency ("LEA"), as defined under 20 U.S.C. § 1401(19)(A). By virtue of receipt of federal funding, Respondent is required to comply with certain provisions of the IDEA, 20 U.S.C. § 1401, *et seq*. As an LEA, under the IDEA, Respondent was required to make a FAPE available to Petitioner. *Sch. Bd. of Lee Cnty. v. E.S.*, 561 F. Supp. 2d 1282, 1291 (M.D. Fla. 2008) (citing *M.M. v. Sch. Bd. of Miami-Dade Cnty.*, 437 F.3d 1085, 1095 (11th Cir. 2006)); *M.H. v. Nassau Cnty. Sch. Bd.*, 918 So. 2d 316, 318 (Fla. 1st DCA 2005).

36. In enacting the IDEA, Congress sought to "ensure that all children with disabilities have available to them a free appropriate public education that emphasized special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *See Phillip C. v. Jefferson Cnty. Bd. of Educ.*, 701 F.3d 691, 694 (11th. Cir. 2012). The statute was intended to address the inadequate educational services offered to children with disabilities and to combat the exclusion of such children from the public school system. 20 U.S.C. § 1400(c)(2)(A)-(B). To accomplish these objectives, the federal government provides funding to participating state and local educational agencies, which is contingent on the agency's compliance with the IDEA's procedural and substantive requirements. *Doe v. Ala. State Dep't of Educ.*, 915 F.2d 651, 654 (11th Cir. 1990); *See also Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017).

37. Local school systems must also satisfy the IDEA's substantive requirements by providing all eligible students with FAPE, which is defined as:

> Special education and related services that—
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;

> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9).

38. "Special education," as that term is used in the IDEA, is defined as:

> [S]pecially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including—
>
> (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings … .

20 U.S.C. § 1401(29).

39. The components of FAPE are recorded in an IEP, which, among other things, identifies the child's present levels of academic achievement and functional performance, establishes measurable annual goals, addresses the services and accommodations to be provided to the child and whether the child will attend mainstream classes, and specifies the measurement tools and periodic reports that will be used to evaluate the child's progress. 20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.320.

40. "The IEP is the centerpiece of the statute's education delivery system for disabled children." *Endrew F.,* 137 S. Ct. 988, 994 (quoting *Honig v. Doe*, 484 U.S. 305 (1988)). "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 181 (1982)).

41. In *Rowley*, the Supreme Court held that a two-part inquiry must be undertaken in determining whether a local school system has provided a

student with FAPE. As an initial matter, it is necessary to examine whether the school district has complied with the IDEA's procedural requirements. In this case, there are no alleged procedural violations.

42. Pursuant to the second step of the *Rowley* test, it must be determined if the IEP developed pursuant to the IDEA is reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206, 207. In *Endrew F.*, the Supreme Court held that, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.,* 137 S. Ct. at 999. As discussed in *Endrew F.*, "[t]he 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials," and that "[a]ny review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Id.*

43. Additionally, deference should be accorded to the reasonable opinions of the professional educators who helped develop an IEP. *Id.* at 1001 ("This absence of a bright-line rule, however, should not be mistaken for an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review" and explaining that "deference is based on the application of expertise and the exercise of judgment by school authorities.").

44. In this case, Petitioner alleged that the IEP did not provide the student with a FAPE and that the IEP was not properly implemented.

45. No persuasive evidence was presented to prove the alleged deficiencies in Petitioner's IEP. The greater weight of the record evidence established that the IEPs were all appropriately ambitious in light of Petitioner's circumstances in all identified areas of need. And, as detailed in the Findings of Fact, Petitioner made progress, including with his behavioral issues.

46. Turning to the issue of implementation, in *L.J. v. School Board*, 927 F.3d 1203 (11th Cir. 2019), the Eleventh Circuit Court of Appeals articulated

the standard for claimants to prevail in a "failure-to-implement case." The court concluded that "a material deviation from the plan violates the [IDEA]." *L.J.*, 927 F.3d at 1206. The *L.J.* court expanded upon this conclusion as follows:

> Confronting this issue for the first time ourselves, we concluded that to prevail in a failure-to-implement case, a plaintiff must demonstrate that the school has materially failed to implement a child's IEP. And to do that, the plaintiff must prove more than a minor or technical gap between the plan and reality; de minimis shortfalls are not enough. A material implementation failure occurs only when a school has failed to implement substantial or significant provisions of a child's IEP.

47. In *L.J.*, the court provided principles to guide the analysis of the implementation standard. *Id.* at 1214. To begin, the court stated that the focus in implementation cases should be on the proportion of services mandated to those actually provided, viewed in context of the goal and import of the specific service that was withheld. In other words, the task is to compare the services that are actually delivered to the services described in the IEP itself. In turn, "courts must consider implementation failures both quantitatively and qualitatively to determine how much was withheld and how important the withheld services were in view of the IEP as a whole." *Id.*

48. Additionally, the *L.J.* court noted that the analysis must consider implementation as a whole:

> We also note that courts should consider implementation as a whole in light of the IEP's overall goals. That means that reviewing courts must consider the cumulative impact of multiple implementation failures when those failures, though minor in isolation, conspire to amount to something more. In an implementation case, the question is not whether the school has materially failed to implement an individual provision in

12

> isolation, but rather whether the school has materially failed to implement the IEP as a whole.

*Id.* at 1215.

49. The record does not reflect a material failure to implement Petitioner's IEP.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is ORDERED that all requests for relief are DENIED.

DONE AND ORDERED this 22nd day of May, 2023, in Tallahassee, Leon County, Florida.

*Brittany J*
_____
BRITTANY O. FINKBEINER
Administrative Law Judge
1230 Apalachee Parkway
Tallahassee, Florida 32399-3060
(850) 488-9675
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 22nd day of May, 2023.

COPIES FURNISHED:

Beverly Oviatt Brown, Esquire
(eServed)

Kelly Hebden Papa, Esquire
(eServed)

Rebekah Gleason Hope, Esquire
(eServed)

James Everett Millard, Esquire
(eServed)

Chelsea Dunn, Esquire
(eServed)

Amanda W. Gay, Esquire
(eServed)

Michael Newsome, M.Ed.
(eServed)

Daniel Marshall, Esquire
(eServed)

Dr. Diana Greene, Superintendent
(eServed)

Andrew King, General Counsel
(eServed)

## NOTICE OF RIGHT TO JUDICIAL REVIEW

This decision is final unless, within 90 days after the date of this decision, an adversely affected party:

> a) brings a civil action in the appropriate state circuit court pursuant to section 1003.57(1)(c), Florida Statutes (2014), and Florida Administrative Code Rule 6A-6.03311(9)(w); or
> b) brings a civil action in the appropriate district court of the United States pursuant to 20 U.S.C. § 1415(i)(2), 34 C.F.R. § 300.516, and Florida Administrative Code Rule 6A-6.03311(9)(w).